UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS C. JOHNSON,                   :
                Petitioner,          :
                                     :
        v.                           :       CA 09-611 S
                                     :
ASHBEL T. WALL, Director,            :
R.I. Dept. of Corrections,           :
PATRICK C. LYNCH,                    :
Attorney General for the             :
State of Rhode Island,               :
                Respondents.         :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge.

    This matter is before the Court on the pro se application of
Petitioner Thomas C. Johnson ("Petitioner" or "Johnson") for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Current
Petition").  The State of Rhode Island ("Respondent" or the
"State") has moved to dismiss the Current Petition because it is
time-barred and Petitioner has failed to exhaust his state
remedies.  See Respondent's Motion to Dismiss Petition for Writ
of Habeas Corpus (Docket ("Dkt.") #7) ("Motion to Dismiss" or
"Motion"); see also Memorandum of Law in Support of Respondent's
Motion to Dismiss Petition for Writ of Habeas Corpus
("Respondent's Mem.") at 3, 5.  Petitioner has filed an objection
to the Motion.  See Petitioner's Objection to Respondent's Motion
to Dismiss Petition for Writ of Habeas Corpus (Dkt. #11)
("Objection").

    The Motion has been referred to me for preliminary review,

findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons explained below, I find that the Current Petition is time-barred.  I therefore recommend that the Motion to Dismiss be granted and that the Current Petition be dismissed with prejudice.

## Facts

The facts are taken from this Magistrate Judge's Report and Recommendation of April 17, 2003, in <u>Johnson v. Wall</u>, CA 03-72 S ("R&R of 4/17/03"), which, in turn, derived the facts from the Rhode Island Supreme Court's decision in <u>State v. Johnson</u>, 667 A.2d 523 (R.I. 1995).

> On the night of July 31, 1992, Petitioner, his wife, their two young sons, and a niece went to the home of Bobby and Audrey Coogan in Pawtucket, Rhode Island, for a visit.  While there, Petitioner slapped his wife across the face.  Shortly thereafter, Petitioner left the Coogan home.  Petitioner's wife and the children departed approximately an hour later and were driven home by Petitioner's brother, who had arrived at the Coogan home just as Petitioner was leaving.  At the trial Petitioner's brother testified that when he dropped Petitioner's wife and sons off at their home shortly after 11:00 p.m., he observed Petitioner's car parked in front of the house and saw Petitioner through the kitchen window.
>
> At 12:26 a.m. on August 1, 1992, the Pawtucket police department received a telephone call from Petitioner, stating that there was a body on the floor of his living room.  When asked for further information, Petitioner stated that he could not "explain it at the moment."  Rescue personnel were dispatched to Petitioner's home and found him standing outside the front door.  A firefighter asked Petitioner about the problem which had prompted the call to the police.  Petitioner answered that "You will see when we get upstairs."  Inside the apartment, Petitioner's wife was found dead on the floor.  She had multiple stab wounds, injuries to her shoulder, bruises on her arms, and "a very large amount of blood over her right shoulder area."

Petitioner told a police officer, who had also responded to the call, that "Yes, I'm the only one here," and "I'm hallucinating, but I haven't been doing any drugs[.]" The officer observed no signs of forced entry into the apartment, but in the kitchen noticed eating utensils, including knives, lying about.  Petitioner was placed under arrest and escorted outside.

Additional police officers who arrived subsequently discovered Petitioner's two young sons asleep in one of the bedrooms.  The officers also seized a knife from the pantry sink.  At Petitioner's trial, the medical examiner testified that the knife was "compatible" with the wounds on the victim's body, and the acting director of the Rhode Island State Crime Laboratory testified that tests confirmed the presence of human blood on the knife[.]

Detectives interviewed the Coogans at their home shortly after 2:30 a.m. on August 1, 1992.  Upon entering the residence, one of the detectives noticed the message light on the couple's telephone answering machine was blinking.   The detective asked for the messages to be played.  All three were from Petitioner:

> 1. "This is Thomas.    It's an emergency. Please.  Hello.   This is an emergency.   All right,  I'll call the police then.    Thank you."
> 2. "Bobby Bobby.   Did I take Maggie home with me?   If so, I killed her.  Please pick up."
> 3. "Yeah, Bobby!    Tommy Johnson.   I think I'm gonna need drastic help.   Really.   Get a hold of me as soon as you can.    Please. Thank you."

At approximately 3:30 a.m., Petitioner gave a videotaped statement to the police in which he claimed to have no memory of events from the time he left the Coogan home until the time he found his wife on the floor of the apartment.  According to Petitioner, "she was laughing and wanted to make love, and that only when he tried to help her up did he notice the blood on her hair and neck. The police then asked [Petitioner] whether he had killed his wife, to which question he responded that he did not know but hoped he had not."

At the trial, Petitioner's eight year old son testified that after he had gone to bed on the night his mother died, he heard his parents arguing and that when

he looked into the kitchen through a peephole, he saw his
father hit his mother.  The boy stated "that his parents
then went into the parlor and that he did not see either
of them again until his father walked into the bathroom
with red paint 'all over him.'"  The boy further
testified that "he heard his father 'washing the paint
off' and saw his father remove a green garbage bag from
the house."

Petitioner was found guilty on September 27, 1994.
He was sentenced to life imprisonment on October 18,
1994.

R&R of 4/17/03 (third alteration in original)(footnotes and

internal citations omitted).

### Travel 1995-2002

The early travel of this matter is taken from the R&R of

4/17/03 which assumed that the allegations contained in the

petition filed in <u>Johnson v. Wall</u>, CA 03-72 S (the "Prior

Petition"), were true.  <u>See</u> R&R of 4/17/03 at 1 n.1.  The same

assumption is made again here.

[O]n March 3, 1995, [Petitioner's] court appointed
appellate counsel "filed a direct appeal, without
consulting with Petitioner."  On April 28, 1995,
Petitioner filed a motion to dismiss his appellate
counsel.  Following a conference on June 22, 1995, the
Rhode Island Supreme Court issued an order, denying the
motion to dismiss but stating that Petitioner could file
a supplemental pro se brief.  On September 8, 1995,
Petitioner notified the court that his counsel and the
superior court would not provide him with the trial
transcript.  Despite this notification, Petitioner's
appeal proceeded without abatement, and it was denied on
December 1, 1995.

Petitioner subsequently applied for post-conviction
relief pursuant to R.I. Gen. Laws §§ 10-9.1-1 to 10-9.1-
9-12 (1997 Reenactment).  An attorney was appointed to
represent Petitioner in his post conviction relief
application, and the attorney entered his appearance on
November 18, 1997.  Petitioner alleges that the attorney

4

did "absolutely nothing for a whole year ...," and did
not even meet with Petitioner[.]  Petitioner moved to
dismiss the attorney, and Petitioner appeared in the
superior court on November 16, 1998, apparently for a
hearing on his motion.  The hearing judge informed
Petitioner that the attorney was on trial and that
Petitioner would be brought back to court in two weeks.
However, Petitioner was returned to court the next day,
November 17, 1998, and advised that the attorney had
moved to withdraw on conflict of interest grounds because
he had previously worked for the Department of Attorney
General.  The hearing judge told Petitioner that he would
appoint another attorney for Petitioner within one week.
Although Petitioner was brought to the courthouse on
November 30, December 7, and December 14, 1998, he was
not taken into the courtroom.

Notwithstanding the hearing judge's statement that
another attorney would be assigned to represent
Petitioner, no attorney contacted Petitioner, and his
weekly trips to the courthouse ceased after December 14,
1998.  Frustrated, Petitioner prepared his own post
conviction relief application [the "First PCRA"], and on
September 28, 2000, he delivered the [First] PCRA and a
Motion to Appoint Counsel (to argue the [First] PCRA
which Petitioner had prepared) to prison officials for
mailing.  Petitioner's [First] PCRA consisted of some 337
pages, of which 44 pages were designated as the
"Application," 160 pages were described as "Facts," and
133 pages were deemed "Exhibits."  The [First] PCRA was
received by the court on October 5, 2000, and docketed on
October 19, 2000.

On January 24, 2001, Petitioner wrote to the
presiding judge of the superior court, Joseph F. Rodgers,
Jr., inquiring as to the status of his [First] PCRA and
Motion to Appoint Counsel.  Judge Rodgers replied on
January 29, 2001, and informed Petitioner that Judge ...
Frank Williams had appointed an attorney on January 24,
2001, to represent Petitioner in his [First] PCRA.

In April of 2001, Petitioner filed a Motion to
Adjudge in Contempt because this second court appointed
attorney had failed to respond to Petitioner's telephone
calls and letters and would not confirm that he had been
appointed to represent Petitioner.  Petitioner requested
that the Motion to Adjudge in Contempt be heard on May 3,
2001, but he was not brought to court on that date.  On
May 14, 2001, Petitioner appeared before Judge Michael A.

Silverstein on the Motion to Adjudge in Contempt, but the attorney failed to appear and the hearing on the Motion to Adjudge in Contempt was continued until May 29, 2001.

When Petitioner was before Judge Silverstein on May 14, 2001, he informed the judge that the State had not responded to his [First] PCRA which he had filed seven months earlier and that it had offered no excuse for the delay in doing so. According to Petitioner, Judge Silverstein suggested that Petitioner consider filing a motion for entry of default. Petitioner stated that he would file such a motion and requested that it also be heard on May 29, 2001, with the Motion to Adjudge in Contempt.

On or about May 15, 2001, the State filed a motion to dismiss [Petitioner]'s [First] PCRA. Among the grounds for dismissal alleged by the State was that the [First] PCRA consists of "340 pages of duplicative allegations, broken down into 41 separate grounds. [The Complaint] fails to contain a short and plain statement of a claim as required by Rule 8(a)."

Petitioner was brought to the courthouse on May 29, 2001, and again on June 18, 2001, but he was not brought into a courtroom on either occasion. On June 25, 2001, Petitioner appeared before Judge Stephen J. Fortunato, Jr. At that time, Petitioner's Motion to Adjudge in Contempt his second attorney was denied, a motion by the State for an enlargement of time within which to respond to the [First] PCRA was "held in abeyance," and the State's Motion to Dismiss PCRA was denied[.] Judge Fortunato indicated that the court would appoint new counsel within fourteen days. [Petitioner]'s Motion for Entry of Default was "not listed on the docket sheet," and was apparently not addressed at the hearing.

A third attorney was appointed by the superior court on June 26, 2001, to represent [Petitioner] in his [First] PCRA. Petitioner was brought to superior court on August 7, 2001, but he was not brought into a courtroom. On September 27, 2001, he was again taken to superior court, although not to a courtroom. On this occasion the third attorney came into the cellblock and handed Petitioner a copy of a "'no-merit' memorandum,"[1] in the form of a three page single spaced letter from the

---

[1] See Shatney v. State, 755 A.2d 130 (R.I. 2000).

attorney to Judge Fortunato[.]   In the letter the
attorney stated that after reviewing the court file,
the four volume trial and sentencing transcript, Petitioner's
pro se [First] PCRA, and speaking with Petitioner, she
was unable to identify "any legal issue having arguable
merit ...."

At a hearing on October 18, 2001, the report from
the third attorney was accepted by Judge Fortunato, and
she was allowed to withdraw as counsel.  Judge Fortunato
also indicated that Petitioner's [First] PCRA was
unacceptable in its present form and that Petitioner
would have sixty days to file a thirty page brief.
Petitioner alleges that the order which the State
subsequently drafted to reflect Judge Fortunato's ruling
incorrectly stated that Petitioner had sixty days to file
a ten page brief.

On October 25, 2001, Petitioner wrote to Judge
Fortunato and requested an explanation of the ruling. He
asked three questions of Judge Fortunato: "1) What
exactly do you want me to take out; 2) The reasons why
you want me to take it out; and 3) If I do take it out,
will it be deemed waived?"  According to Petitioner,
Judge Fortunato did not reply.

Petitioner was returned to superior court on April
19, 2002, for a hearing on his Motion for Entry of
Default, but the motion was denied by Judge Fortunato.
On June 27, 2002, Petitioner filed a Motion for
Clarification, to which he alleges the court [did] not
respond[].  Thereafter, he wrote "to the Administrative
Clerk of Court on August 3, 2002, concerning his Motion
for Clarification ...."  Presumably, Petitioner received
no response to his letter, although he [did] not
explicitly so state in his [Prior] Petition.

R&R of 4/17/03 (third, seventeenth, twenty-fourth, and twenty-

seventh alterations in original)(footnotes and internal citations

omitted).

**Travel 2003-2010**

According to Petitioner:

Due to the inordinate delay by the State, and a lack
of a final Order of the [c]ourt's decision, on February

14, 2003, Petitioner filed a Petition For Writ of Habeas
Corpus in the United States District Court for the
District Of Rhode Island pursuant to 28 U.S.C. §
2254(b)(1)(B)(i) and (ii), Docket No. C.A. 03-072S [the
"Prior Petition"].  The Court [d]ismissed the [Prior]
[P]etition, without prejudice, for failure to exhaust
State remedies;[2] Petitioner requested a Certificate Of
Appeal[a]bility (COA), denied; Petitioner appealed to the
U.S. Court of Appeals for the First Circuit, No. 03-2379,
COA denied, rehearing and en banc, denied. ...

Current Petition at 8-9.

Thereafter, Petitioner returned to superior court and filed

another motion to appoint counsel for his First PCRA "due to the

fact that the [c]ourt never dismissed his [First] PCRA." Id. at

9.  On November 22, 2005, Judge Fortunato appointed a fourth

attorney to help Petitioner condense his First PCRA.  Id.  That

attorney entered his appearance on January 27, 2006.  Id.  On

April 19, 2006, the attorney informed Petitioner by letter that

the court file did not contain a copy of his First Petition.  Id.

Petitioner ultimately supplied counsel with a copy.  See id. at

9-10.  On June 26, 2007, counsel filed a motion for

clarification, which was heard on July 17, 2007, before Judge

Allen P. Rubine.  See id. at 10.  Judge Rubine dismissed the

First PCRA because Petitioner had not complied with Judge

Fortunato's ten day order.  See id.

Petitioner mailed another PCRA on April 16, 2008

---

[2] The R&R of 4/17/03, recommending dismissal without
prejudice for failure to exhaust state remedies, was accepted by
U.S. District Judge William E. Smith in a Memorandum and Order
dated September 3, 2003.  See Dkt. in Johnson v. Wall, CA 03-72
S.

[the "Second PCRA"], which was docketed on April 29, 2008: Case, <u>Thomas C. Johnson v. A.T. Wall</u>, P.M.-2008-3183 ....

On May 2, 2008, [the] case [was] sent to Judge Savage for assignment to a Judge for [Petitioner's Second PCRA].

On May 14, 2008, the State filed their [sic] answer, ... moving to dismiss claiming: "failure to state a claim on which relief may be granted;" [""]collateral estoppel and res judicata;" [and] "in it's [sic] entirety on the grounds of latches." **Essentially claiming that Petitioner is procedurally barred.**

....

On October 20, 2008, Petitioner was brought in to Superior Court before Judge Pfeiffer, but the Judge needed more time to familiarize himself with the case.

On November 10, 2008, Petitioner was brought back before Judge Pfeiffer, and the Judge stated he could not understand why Petitioner was never allowed a hearing on the merits, which he was entitled to[] once an attorney filed a so-called "no-merit" brief on September 7, 2001, pursuant to <u>Shatney v. State</u>, 755 A.2d 130, 136 (R.I. 2000). Judge Pfeiffer asked the State's attorneys (prosecutor) three (3) times why there was never a hearing, and the attorneys would not respond, then the Judge asked Petitioner and Petitioner told him, "because, if they had a hearing on the merits, they would have to take these (handcuffs) off and I would walk out that door." The Judge just shrugged and stated, "you're gonna have a hearing." He denied Petitioner's Motion for Counsel stating Petitioner already had four (4) attorneys appointed, and he stated he would assign the case to Judge McGuirl for hearings. He never heard any of Petitioner's other motions.[3]

---

[3] The "other motions" to which Petitioner refers are a motion to correct docket, a motion to assign, a motion and affidavit to proceed in forma pauperis, a motion for bail or recognizance, and a writ of habeas corpus to bring him to court. <u>See</u> Current Petition at 10-11. He has since filed another motion for appointment of counsel, another motion to assign, and a motion entitled "Request for Status Conference," Current Petition at 12, requesting a hearing on all prior motions, ground rules

Current Petition at 10-12 (ninth alteration in original).

Petitioner filed the Current Petition in this Court on December 18, 2009.  See Dkt. in Johnson v. Wall, CA 09-611 S.  On February 8, 2010, the State filed its Motion to Dismiss, and Petitioner filed his Objection on June 3, 2010.  The Court conducted a hearing on the Motion to Dismiss on June 17, 2010,[4] and, thereafter, took the matter under advisement.

## Discussion

Respondent argues that the Current Petition is time-barred and should, accordingly, be dismissed.  See Respondent's Mem. at 3.  Respondent further contends that, even if the Current Petition were not time-barred, it should be dismissed for failure to exhaust state remedies.  See id. at 5.  Petitioner counters that "he has made a prima facie showing of actual innocence to pass the gateway for any possible time bar ...," Memorandum of Law in Support of Petitioner's Objection to Respondent's Motion to Dismiss Petition for Writ of Habeas Corpus ("Petitioner's Mem.") at 18-19, and that he should be "excused from the exhaustion doctrine pursuant to 28 U.S.C. § 2254(b)(1)(B)(i) and

_____

for future proceedings, and dates for future hearings, see id.

[4] At the June 17th hearing, counsel for the State represented that Judge Susan E. McGuirl had set Petitioner's Second PCRA down for a status hearing in July.  According to a letter from Petitioner dated July 14, 2010, and received by this Court on July 19, 2010, that status conference apparently was held on July 12, 2010, and Judge McGuirl advised Petitioner that an attorney would be appointed to represent him with respect to the Second PCRA.  See Letter from Petitioner to Court of 7/14/10 at 1.

(ii) because the State has caused inordinate delay ...," <u>id.</u> at 6.

**I.    Timeliness**

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 110 Stat. 1214, became effective on April 24, 1996, <u>see</u> <u>David v. Hall</u>, 318 F.3d 343, 344 (1st Cir. 2003); <u>see also</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 170, 121 S.Ct. 2120 (2001), partly to combat increasingly pervasive abuses of the federal courts' habeas jurisdiction, <u>Delaney v. Matesanz</u>, 264 F.3d 7, 10 (1st Cir. 2001)(citing <u>Felker v. Turpin</u>, 518 U.S. 651, 664, 116 S.Ct. 2333 (1996)); <u>Neverson v. Bissonnette,</u> 261 F.3d 120, 124 (1st Cir. 2001)(same).  Prior to AEDPA, a prisoner was under no obligation to act promptly in seeking habeas relief.  <u>Neverson v. Farquharson</u>, 366 F.3d 32, 44 (1st Cir. 2004).  However,

> Congress enacted AEDPA in 1996, amending the procedures
> governing federal habeas corpus review.  Under AEDPA, §
> 2254 petitions for federal review of state convictions
> allegedly imposed in violation of the Constitution or
> federal law are subject to a one-year statute of
> limitations that typically runs from the date the
> petitioner's conviction became final.  For prisoners like
> [Petitioner], whose state convictions became final before
> AEDPA was passed, the limitations period commenced on
> AEDPA's effective date, April 24, 1996.

<u>Currie v. Matesanz</u>, 281 F.3d 261, 264 (1st Cir. 2002); <u>see also</u> <u>Cordle v. Guarino</u>, 428 F.3d 46, 48 (1st Cir. 2005)(noting that defendants convicted prior to AEDPA's enactment "can file their petitions within one year of AEDPA's effective date")(quoting <u>David v. Hall</u>, 318 F.3d at 344); <u>Lattimore v. Dubois</u>, 311 F.3d

46, 53 (1st Cir. 2002)(stating that "in this circuit, as elsewhere, ... the grace period for prisoners whose state convictions became final prior to AEDPA to file a petition under 28 U.S.C. § 2254 is one year" and that "[t]he one-year grace period runs from the date of AEDPA's enactment and ends on April 24, 1997"); Trenkler v. United States, 268 F.3d 16, 19 (1st Cir. 2001)("For prisoners whose convictions became final before AEDPA was enacted, we have held that the limitations period expires on April 24, 1997, one year after the statute's effective date.").

In the instant case, Petitioner's conviction became final prior to April 24, 1996, as the Rhode Island Supreme Court denied Petitioner's direct appeal and affirmed the judgment of conviction on December 1, 1995, see State v. Johnson, 667 A.2d 523, 530 (R.I. 1995),[5] and his conviction became final ninety

---

[5] Petitioner argues that he did not want the appeal heard. See Current Petition at 5. However, under the Rhode Island Supreme Court's rules, he had only a limited time frame within which to file such direct appeal. See R.I. Sup. Ct. Rules, Art. I, Rule 4.

> (b) Appeals in Criminal Cases. In a criminal case the notice of appeal by a defendant shall be filed with the clerk of the Superior Court within twenty (20) days after the entry of the judgment or order appealed from. A notice of appeal filed after the announcement of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof. If a timely motion in arrest of judgment or for a new trial on any ground other than newly discovered evidence has been made, an appeal from a judgment of conviction may be taken within twenty (20) days after the entry of an order denying the motion. A motion for a new trial based on the ground of newly discovered evidence will similarly extend the time for

12

days thereafter, <u>see</u> <u>Neverson v. Farquharson</u>, 366 F.3d at 36
(stating that a defendant's "conviction became final when the
ninety-day period for seeking certiorari expired"); <u>Cordle v.</u>
<u>Guarino</u>, 428 F.3d at 48.  Thus, he had until April 24, 1997, to
file an application for federal habeas relief.  <u>Delaney v.</u>
<u>Matesanz</u>, 264 F.3d at 11; <u>see also</u> <u>Lattimore v. Dubois</u>, 311 F.3d
at 53; <u>Trenkler v. United States</u>, 268 at 19.

------------------------

> appeal from a judgment of conviction if the motion is
> made before or within ten (10) days after entry of the
> judgment.  A judgment or order is entered within the
> meaning of this subdivision when it is entered in the
> criminal docket.  Upon a showing of excusable neglect the
> Superior Court may, before or after the time has expired,
> with or without motion and notice, extend the time for
> filing a notice of appeal for a period not to exceed
> thirty (30) days from the expiration of the time
> otherwise prescribed by this subdivision.

R.I. Sup. Ct. Rules, Art. I, Rule 4(b).  According to 28 U.S.C. §
2244(d)(1):

> A 1-year period of limtation shall apply to an
> application for a writ of habeas corpus by a person in
> custody pursuant to the judgment of a State court.  The
> limitation period shall run from the latest of--
> (A) the date on which the judgment became final by the
> conclusion of direct review or **the expiration of time for
> seeking such review**.
>
>     ....

28 U.S.C. § 2244(d)(1) (bold added).  Thus, although Petitioner
contends that the "R.I. Supreme Court forced that ... appeal on
Petitioner ...," Petitioner's Mem. at 5, his argument that he
should not be held "responsible for the date/time line of the
finality of an appeal ...," <u>id.</u> at 4-5, that he did not want, is
unavailing.

Petitioner filed the Prior Petition on February 14, 2003,[6] see Current Petition at 8, well beyond the April 24, 1997, deadline for such filing.  While "[s]ection 2244(d)(2)[7] provides for tolling during the pendency of a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim," Duncan v. Walker, 533 U.S. at 176 (internal quotation marks omitted), according to Petitioner he "handed over his [First] PCRA (with facts and exhibits) along with his Motion to Appoint Counsel to argue his petition, to prison officials for mailing on September 28, 2000.  The Application was received by the [c]ourt on October 5, 2000, and docketed on October 19, 2000," Current Petition at 5-6.

_____

[6] In the R&R of 4/17/03 the Court stated that the Prior Petition was filed on March 4, 2003, referring to the date that it was received by the Clerk's Office.  See R&R of 4/17/03 at 9. The February 14, 2003, date alleged in the Current Petition is presumably based on the "mailbox rule."  Donovan v. Maine, 276 F.3d 87, 90 (1st Cir. 2002) (explaining that "if an inmate is confined in an institution, his notice of appeal (or federal habeas petition) will be timely if it is deposited in the institution's internal mail system on or before the last day for filing")(quoting Nara v. Frank, 264 F.3d 310, 315 (3rd Cir. 2001)).  For purposes of this Report and Recommendation, the Court assumes that Petitioner deposited the Prior Petition in the prison's internal mail system on February 14, 2003.

[7] Section 2244(d)(2) provides that:

The time during which a properly filed application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

14

This, too, was beyond the one-year grace period for filing for federal habeas relief.  Even taking Petitioner's statement that the state courts failed to "respond[] to Petitioner's needs for an attorney to file his PCRA ...," Current Petition at 5, as true, the earliest mention in Plaintiff's filings of an attorney entering an appearance for Petitioner is November 18, 1997, see id., more than six months after the passing of the one-year grace period.  Accordingly, because Petitioner's First PCRA was filed after the deadline for filing a federal habeas petition, there was nothing to toll, see Cordle v. Guarino, 428 F.3d at 48 n.4 ("Section 2244(d)(2) only stops, but does not reset, the [AEDPA] clock from ticking and cannot revive a time period that has already expired.")(alteration in original).

The Current Petition was filed on December 18, 2009, more than twelve years after the deadline for Petitioner to file an application for writ of habeas corpus in federal court had passed.  While, as noted above, the time during which a properly filed state post-conviction relief application tolls the limitation period, the Supreme Court has held that the pendency of a federal habeas petition does not toll the limitation period. See Duncan v. Walker, 533 U.S. at 181-82 ("We hold that an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2).  Section 2244(d)(2) therefore did not toll the limitation period during

15

the pendency of respondent's first habeas petition."). Thus, neither Petitioner's First PCRA nor his Prior Petition tolled the limitation period for filing for habeas relief in federal court.

At the hearing, Petitioner additionally argued that the prison library did not contain a copy of the AEDPA. Presumably he contends that, as a result, he was unaware of the statute's limitation period and therefore should be excused from its requirements. However, the First Circuit has held that "[i]gnorance of the law alone, even for incarcerated *pro se* prisoners, does not excuse an untimely filing." Lattimore v. Dubois, 311 F.3d at 55 (citing Delaney v. Matesanz, 264 F.3d at 15); see also Neverson v. Farquharson, 366 F.3d at 44 (citing Lattimore for proposition that petitioner was charged with knowledge of AEDPA's requirements). Accordingly, the Court rejects Petitioner's implied argument that the absence of a copy of the AEDPA in the prison library excuses him from filing a petition for writ of habeas corpus in federal court prior to the expiration of the grace period.

Because the Current Petition was filed well after the expiration of the one-year grace period for filing for federal habeas corpus relief after AEDPA's enactment, no tolling provision applies, and the lack of a copy of the statute in the prison library does not relieve Petitioner of compliance with AEDPA's requirements, the Court finds that the Current Petition is time-barred and should be dismissed on this basis. I so

16

recommend.

## II.  Actual Innocence

Petitioner argues that he "has a claim of actual innocence which is a gateway to pass through the procedural bar of Title 28, Section 2244(d)(1), and failure to review Petitioner's claim will result in a [m]iscarriage of justice."  Petitioner's Mem. at 1; see also id. at 18-19.  According to Petitioner, his "is the rare case where -- had the jury heard all the conflicting testimony -- it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt."  Id. at 4 (quoting House v. Bell, 547 U.S. 518, 554, 126 S.Ct. 2064 (2006)).

"[T]he statutory one-year limit on filing initial habeas petitions is not mitigated by any statutory exception for actual innocence even though Congress clearly knew how to provide such an escape hatch."  David v. Hall, 318 F.3d at 347; cf. Barreto-Barreto v. United States, 551 F.3d 95, 102 (1st Cir. 2008)("We have not adopted an actual innocence exception to § 2255's one-year limitations period in this circuit.").  The procedural bar to which Petitioner refers "is not, however, unqualified."  House v. Bell, 547 U.S. at 536.  In House, the Supreme Court stated that:

> In an effort to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case, the Court has recognized a miscarriage-of-justice exception.  [I]n

17

> appropriate cases, the Court has said, the principles of
> comity and finality that inform the concepts of cause and
> prejudice must yield to the imperative of correcting a
> fundamentally unjust incarceration.
>
> In Schlup [v. Delo, 513 U.S. 298, 115 S.Ct. 851
> (1995)], the Court adopted a specific rule to implement
> this general principle.  It held that prisoners asserting
> innocence as a gateway to defaulted claims must establish
> that, in light of new evidence, it is more likely than
> not that no reasonable juror would have found petitioner
> guilty beyond a reasonable doubt.   This formulation,
> Schlup explains, ensures that petitioner's case is truly
> extraordinary, while still providing petitioner a
> meaningful avenue by which to avoid a manifest injustice.
> In the usual case the presumed guilt of a prisoner
> convicted in state court counsels against federal review
> of defaulted claims.   Yet a petition supported by a
> convincing Schlup gateway showing raise[s] sufficient
> doubt about [the petitioner's] guilt to undermine
> confidence in the result of the trial without the
> assurance that that trial was untainted by constitutional
> error; hence, a review of the merits of the
> constitutional claims is justified.

547 U.S. at 536-37 (first, third, and fourth alterations in

original)(internal citations and quotation marks omitted); see

also Schlup v. Delo, 513 U.S. at 313-16.  Thus, a petitioner's

claim of innocence is "not itself a constitutional claim, but

instead a gateway through which a habeas petitioner must pass to

have his otherwise barred constitutional claim considered on the

merits."  Schlup v. Delo, 513 U.S. at 315.

The Supreme Court in House emphasized several features of

the Schlup standard.  First, the Court stated that "although [t]o

be credible a gateway claim requires new reliable evidence-

whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence-that was not

presented at trial, the habeas court's analysis is not limited to

18

such evidence." House v. Bell, 547 U.S. at 537 (alteration in original)(internal citation and quotation marks omitted). Rather,

> Schlup makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

Id. at 538 (internal citations and quotation marks omitted); see also Schlup v. Delo, 513 U.S. at 327-28 ("[T]he emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial."). Second, the Supreme Court repeated that:

> [T]he Schlup standard is demanding and permits review only in the extraordinary case. At the same time, though, the Schlup standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

House v. Bell, 547 U.S. at 538 (internal citations and quotation marks omitted); see also id. at 522 (noting "stringent showing" required by actual innocence exception); Schlup v. Delo, 513 U.S. at 327; Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010)(noting

that the "exception is exceedingly narrow in scope ... and

requires proof of actual innocence, not just legal innocence")

(internal quotation marks omitted).  Finally, the Supreme Court

noted that:

> Because a <u>Schlup</u> claim involves evidence the trial jury
> did not have before it, the inquiry requires the federal
> court to assess how reasonable jurors would react to the
> overall, newly supplemented record.  If new evidence so
> requires, this may include consideration of the
> credibility of the witnesses presented at trial.

<u>House v. Bell</u>, 547 U.S. at 538-39 (internal citation and

quotation marks omitted); <u>see also</u> <u>Schlup v. Delo</u>, 513 U.S. at

330.

The gravamen of Plaintiff's actual innocence claim is that:

> The State presented to the jury that Petitioner did
> commit this murder at <u>12:00 a.m.</u>, then waited <u>26 minutes</u>
> for the victim to bleed out, cleaned himself up, changed
> his clothing and somehow got rid of the bloody clothing,
> and then called for assistance at <u>12:26 a.m.</u>, and when
> after the rescue arrived the police arrived at <u>12:32
> a.m.</u>, the victim was already deceased and rig[or] mortis
> had already set in.
> Where the State and defense counsel withheld from
> the [c]ourt and jury that the Medical Examiner's Report
> purports, "approximate time of incident <u>12:30 a.m.</u>, and
> the approximate time of death <u>3:00 a.m.</u>  The Medical
> Examiner was never asked about the time of incident or
> death.  Petitioner couldn't possibly have time to clean
> himself up, change his clothing and get rid of bloody
> clothing.  Also, the victim was operated on at the
> Memorial Hospital after 2:10 a.m.: Time in 2:10 a.m.,
> Incision 2:30 a.m., Closure 3:00 a.m., Time out 4:15 a.m.

Petitioner's Mem. at 4 (internal citations to Medical Examiner's

Report and Operating Room Report omitted).  Petitioner

additionally alleges that his son testified that he saw his

father (Petitioner) "wearing a work uniform with his name on it,"

id. at 3, but Petitioner did not own such a uniform, see id.;
that when tested the police found no traces of blood on him, see
id.; and that the police failed to investigate other possible
suspects, see id.

After considering the foregoing evidence, as well as the
evidence presented at trial, this Court cannot find that this is
the "'extraordinary' case," House v. Bell, 547 U.S. at 538
(quoting Schlup v. Delo, 513 U.S. at 327), which "raise[s]
sufficient doubt about [the petitioner's] guilt to undermine
confidence about the result of the trial without the assurance
that that trial was untainted by constitutional error ...," id.
at 537 (quoting Schlup v. Delo, 513 U.S. at 317)(alterations in
original)(internal quotation marks omitted), thereby justifying a
review of the merits of Petitioner's constitutional claims, see
id. Petitioner has not met the demanding Schlup standard by
demonstrating that "more likely than not, in light of the new
evidence, no reasonable juror would find him guilty beyond a
reasonable doubt ...." Id. at 538.

The evidence against Petitioner consisted of the prior
altercation between Petitioner and his wife, see State v.
Johnson, 667 A.2d at 525; Petitioner's brother's testimony that
when he drove Petitioner's wife and two sons home he observed
Petitioner's car in front of the house and saw Defendant inside
through the kitchen window, see id.; Petitioner's statement to
the Pawtucket Police that he "d[id]n't think" the rescue squad

21

was needed, id.; the fact that Petitioner was alone (other than his two young sons, who were subsequently discovered asleep in one of the bedrooms) in the apartment with the victim when the police arrived, a fact confirmed by Petitioner, see id.; the absence of signs of forced entry, see id.; the presence of eating utensils, including knives, in the kitchen, see id.; the discovery of a knife in the pantry sink, see id.; testimony presented at trial that human blood was present on the knife and that the knife was "compatible" with the wounds on the victim's body, see id.; Petitioner's messages on the Coogans' answering machine, including his statement that if he had taken his wife home with him "I killed her," id. at 526; Petitioner's response when asked if he had killed his wife that he "hoped he had not," id.; and Petitioner's son's testimony that he had heard his parents arguing on the night his mother died, saw his father hit his mother, later saw his father in the bathroom with "red paint 'all over him,'" heard his father "washing the paint off," and saw his father remove a garbage bag from the house, id.

     Plaintiff's argument that the medical examiner's report is inconsistent with the prosecution's theory of the case (specifically the prosecution's contention that when the police arrived at 12:32 a.m. the victim was already deceased, whereas the medical examiner's report lists the time of incident as 12:30 a.m. and approximate time of death as 3:00 a.m., see Petitioner's Mem. at 4; see also id., Appendix at 1-2) is undermined by his

22

response to the Pawtucket Police when asked if he needed the rescue team that "I don't think so ...," State v. Johnson, 667 A.2d at 523.  His contention that he "couldn't possibly have time to clean himself up, change his clothing and get rid of bloody clothing," Petitioner's Mem. at 4, is undermined by his son's testimony regarding what he saw on the night his mother was killed, see State v. Johnson, 667 A.2d at 526.

Petitioner's other allegations, regarding the lack of investigation of other suspects, lack of a work uniform in Petitioner's possession, and "other perjury [and] fabrication ...," Petitioner's Mem. at 3-4, are not developed and are deemed waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)(noting "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); id. ("Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."); see also Pike v. Guarino, 492 F.3d 61, 79 n.9 (1st Cir. 2007)(quoting United States v. Zannino); Figueroa-Torres v. Toledo-Dávila, 232 F.3d 270, 273 n.2 (1st Cir. 2000) (same).  Petitioner's contentions that an old boyfriend of the victim (who "would have a work uniform," Current Petition at 15) and that a family against whom his wife had threatened legal action (who owned a business and also wore work uniforms and who were later investigated for another murder) might have been

23

responsible for his wife's killing amount to mere speculation. As an example of perjury, Petitioner asserted at the June 17, 2010, hearing that a detective lied about when a piece of carpet was removed from the crime scene. When asked how this showed his actual innocence, Petitioner responded that it showed that the police changed the crime scene. The Court is not persuaded that, even if the crime scene had been changed, a finding of actual innocence necessarily follows. The "other fabrications," Current Petition at 16, to which Petitioner refers, are left unexplained.

Because Petitioner has not demonstrated that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt had it seen the evidence Petitioner claims was "withheld from the court and jury ...," id. at 15, this Court finds that he has not made a "prima facie showing of actual innocence to pass the gateway for any possible time bar ...," Petitioner's Mem. at 18-19; see also Schlup v. Delo, 513 U.S. at 315. Accordingly, I recommend that the Court find Petitioner's constitutional claims time-barred and decline to review them.

**III. Exhaustion**

The Court has found that the Current Petition is time-barred and that Petitioner has not made a prima facie showing of actual innocence enabling him to pass through the gateway and have his time-barred claims heard. Therefore, the Court need not address Respondent's exhaustion argument.

24

## Conclusion

For the reasons explained above, I recommend that the Motion to Dismiss be granted and that the Current Petition be dismissed with prejudice.  Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); D.R.I. LR Cv 74(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ David L. Martin</u>
David L. Martin
United States Magistrate Judge
August 12, 2010